# No. 24-50600

## In the United States Court of Appeals for the Fifth Circuit

UNITED STATES OF AMERICA,
*Plaintiff-Appellee,*

v.

THOMAS SCOTT PERKINS,
*Defendant-Appellant.*

Appeal from the United States District Court
for the Western District of Texas, No. 4:20-cr-388

## BRIEF OF APPELLANT
## THOMAS SCOTT PERKINS

MAUREEN SCOTT FRANCO
Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
Tel.: (210) 472-6700
Fax: (210) 472-4454

CARL R. HENNIES
Assistant Federal Public Defender

*Attorney for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

### UNITED STATES v. THOMAS SCOTT PERKINS,
### No. 24-50600

The undersigned counsel of record certifies that the persons having an interest in the outcome of this case are those listed below:

1. **Thomas Scott Perkins,** Defendant-Appellant;

2. **Jaime Esparza,** U.S. Attorney;

3. **Ashley Hoff** and **John F. Bash,** former U.S. Attorneys;

4. **John Cannizzaro, Kevin Cayton, Eduardo Mendoza, Antonio Franco, Scott Greenbaum, Lance Kennedy, Martha Valadez, Matthew Ellis, Fidel Esparza III,** and **Andrew Cannon Weber,** Assistant U.S. Attorneys, who represented Plaintiff-Appellee in the district court;

5. **Elizabeth Berenguer,** Assistant U.S. Attorney, who represented Plaintiff-Appellee in this Court;

6. **Maureen Scott Franco,** Federal Public Defender;

7. **Christopher Carlin, Michael Gorman,** and **Elyse Bataller-Schneider,** Assistant Federal Public Defenders, who represented Defendant-Appellant in the district court;

8. **Shane O'Neal,** former Assistant Federal Public Defender, who represented Defendant-Appellant in the district court; and

9. **Carl R. Hennies,** Assistant Federal Public Defender, who represents Defendant-Appellant in this Court.

This certificate is made so that the judges of this Court may evaluate possible disqualification or recusal.

s/ Carl R. Hennies
CARL R. HENNIES
*Attorney for Defendant-Appellant*

## REQUEST FOR ORAL ARGUMENT

The district court sentenced Thomas Perkins to 30 years in prison, including an 8-year variance above the Sentencing Guidelines range. That sentence would be exceedingly harsh—and would result in a drastic sentencing disparity—even if Thomas were a typical defendant. But he is not. The district court never grappled with how autism spectrum disorder impacted Thomas's offense conduct, mitigated his culpability, and makes prison especially daunting and dangerous. Instead, the district court relied on supposedly aggravating factors that are inextricably linked to autism. Oral argument would help the Court analyze whether Thomas's sentence is reasonable.

# TABLE OF CONTENTS

Request for oral argument.................................................................iii

Table of authorities ....................................................................... vi

Jurisdiction ..................................................................................... 1

Introduction ................................................................................... 2

Statement of the issue .................................................................... 4

Statement of the case ..................................................................... 5

Summary of the argument ............................................................ 20

Standard of review........................................................................ 23

Argument ...................................................................................... 23

   Thomas's sentence is substantively unreasonable. .................... 23

     A.  Anchored by the advisory Guidelines range, a
          sentence must be no greater than necessary to comply
          with the statutory sentencing factors. .............................. 24

     B.  The district court's 30-year sentence—including an 8-
          year variance above an already harsh Guidelines
          range—is far greater than necessary. ............................... 25

         1.  As a starting point, the non-production child
             pornography guideline is particularly harsh
             because of escalating enhancements.......................... 26

         2.  The district court disregarded Thomas's autism
             spectrum disorder, which mitigates his culpability
             and makes prison daunting....................................... 28

            a.  Characteristics of autism spectrum disorder
                make individuals like Thomas uniquely
                vulnerable to accessing child pornography............ 29

b.   Prison is especially daunting and dangerous for autistic individuals, and Thomas has already been attacked by another inmate. ....................... 37

3.   The district court placed unjustifiable weight on supposedly aggravating factors inextricably linked to autism spectrum disorder. ...................................... 40

a.   Because compulsive collecting is a common symptom of autism, it is no surprise that Thomas had a large collection. ............................ 40

b.   Although Thomas had videos portraying disturbing content, autistic individuals struggle to perceive the abuse taking place. ......... 43

c.   Thomas admitted that he had a sexual interest in children, but autistic individuals are rarely dangerous. .......................................................... 45

4.   The district court created a drastic and unwarranted sentencing disparity between Thomas and other defendants. ................................................................. 49

a.   Thomas's sentence is more than double the average sentence received by non-production child pornography defendants. ............................ 49

b.   The divergence between Thomas's sentence and sentences received by individuals with autism is even more extreme. .............................. 51

5.   The district court clearly erred in balancing the sentencing factors because none of them justify a significant upward variance. ..................................... 52

Conclusion ............................................................................. 61

v

# TABLE OF AUTHORITIES

**Cases**

*Farmer v. Brennan,*
  511 U.S. 825 (1994) ..................................................... 39

*Freeman v. United States,*
  564 U.S. 522 (2011) ................................................ 24, 25

*Gall v. United States,*
  552 U.S. 38 (2007) ..........................................................*passim*

*New York v. Ferber,*
  458 U.S. 747 (1982) ..................................................... 42

*Penry v. Lynaugh,*
  492 U.S. 302 (1989) ..................................................... 36

*Peugh v. United States,*
  569 U.S. 530 (2013).................................................... 24

*Rita v. United States,*
  551 U.S. 338 (2007)................................................ 27, 60

*United States v. Booker,*
  543 U.S. 220 (2005).................................................... 52

*United States v. Carpenter,*
  No. 6:08-cr-6256 (W.D.N.Y. June 17, 2009)................................ 51

*United States v. Castro-Valenzuela,*
  304 F. App'x 986 (3d Cir. 2008) ................................... 57

*United States v. Chatman,*
  986 F.2d 1446 (D.C. Cir. 1993) ................................... 36

*United States v. Diehl,*
  775 F.3d 714 (5th Cir. 2015) ..................................... 25

*United States v. Dorvee,*
  616 F.3d 174 (2d Cir. 2010) ........................................ 26, 27, 28

*United States v. Dubin,*
No. 1:12-cr-20828 (E.D. Mich. June 20, 2013) ............................ 51

*United States v. Grober,*
624 F.3d 592 (3d Cir. 2010) ........................................................ 28

*United States v. Hebert,*
813 F.3d 551 (5th Cir. 2015)........................................................ 25

*United States v. Hesson,*
46 F. App'x 226 (5th Cir. 2002) ................................................... 57

*United States v. Hudgens,*
4 F.4th 352 (5th Cir. 2021) .......................................................... 25

*United States v. Huseth,*
2021 WL 4940915 (D. Kan. Oct. 22, 2021) ........................... 35, 51

*United States v. Irey*
612 F.3d 1160 (11th Cir. 2010) .................................................... 57

*United States v. Joy,*
No. 1:07-cr-187 (N.D.N.Y. July 28, 2008).................................... 51

*United States v. Killen,*
729 F. App'x 703 (11th Cir. 2018) ............................................... 49

*United States v. Knott,*
638 F. Supp. 3d 1310 (M.D. Ala. 2022) ...............................*passim*

*United States v. Mallatt,*
2013 WL 6196946 (D. Neb. Nov. 27, 2013)...................... 35, 43, 51

*United States v. McLaurin,*
731 F.3d 258 (2d Cir. 2013) ........................................................ 56

*United States v. Miller,*
665 F.3d 114 (5th Cir. 2011) ....................................................... 28

*United States v. Olhovsky,*
562 F.3d 530 (3d Cir. 2009).................................................. 58, 59

*United States v. Perkins,*
99 F.4th 804 (5th Cir. 2024) ....................................................... 17

*United States v. Shore,*
 2020 WL 3791550 (E.D. Pa. July 7, 2020) .................................. 35

*United States v. Stone,*
 575 F.3d 83 (1st Cir. 2009) ......................................... 26

*United States v. Zayas,*
 758 F.3d 986 (8th Cir. 2014) ....................................... 57

*United States v. Zuk,*
 No. 5:13-cr-59 (W.D.N.C. Feb. 3, 2017) ....................... 51

*Wisconsin v. Mitchell,*
 508 U.S. 476 (1993) ................................................. 56

**Statutes**

18 U.S.C. § 2252A(a)(2) ........................................ 12, 14

18 U.S.C. § 2252A(a)(5)(B) ........................................ 12

18 U.S.C. § 2252A(b)(1) ........................................... 14

18 U.S.C. § 3231 .................................................... 1

18 U.S.C. § 3553(a) ............................................ 24, 25

18 U.S.C. § 3553(a)(1) .............................................. 53

18 U.S.C. § 3553(a)(2)(A) ................................. 53, 55, 58

18 U.S.C. § 3553(a)(2)(B) ........................................... 55

18 U.S.C. § 3553(a)(2)(C) ........................................... 55

18 U.S.C. § 3553(a)(2)(D) ........................................... 53

18 U.S.C. § 3553(a)(3) .............................................. 57

18 U.S.C. § 3553(a)(4)(A) ........................................... 26

18 U.S.C. § 3553(a)(6) .......................................... 49, 58

18 U.S.C. § 3742(a) ................................................. 1

28 U.S.C. § 1291 .......................................................................... 1

## Rules

Fed. R. App. P. 4(b)(1)(A)(i) ...................................................... 1

## Sentencing Guidelines

U.S.S.G. § 2G2.1 ........................................................................ 50

U.S.S.G. § 2G2.2 ................................................................. 15, 26

U.S.S.G. § 2G2.2(a)(2) ............................................................. 14

U.S.S.G. § 2G2.2(b)(2) ............................................................. 15

U.S.S.G. § 2G2.2(b)(3)(F) ........................................................ 15

U.S.S.G. § 2G2.2(b)(4) ............................................................. 15

U.S.S.G. § 2G2.2(b)(6) ............................................................. 15

U.S.S.G. § 2G2.2(b)(7)(D) ....................................................... 15

## Other Authorities

Am. Psychiatric Ass'n,
  *Diagnostic and Statistical Manual of
  Mental Disorders* (5th ed. 2013) ...........................................*passim*

Catherine A. Cheely et al.,
  *The Prevalence of Youth with Autism Spectrum
  Disorders in the Criminal Justice System*,
  42 J. AUTISM & DEV. DISORDERS 1856 (2012) ............................ 48

Christine N. Cea,
  *Autism and the Criminal Defendant*,
  88 ST. JOHN'S L. REV. 495 (2014)..................................... 30, 38, 44

Colleen M. Berryessa,
  *Defendants with Autism Spectrum Disorder in
  Criminal Court: A Judges' Toolkit*,
  13 DREXEL L. REV. 841 (2021)......................................... 38, 44

Dennis P. Sugrue,
  *Forensic Assessment of Individuals on the Autism
  Spectrum Charged with Child Pornography Violations*,
  *in* CAUGHT IN THE WEB OF THE CRIMINAL JUSTICE SYSTEM:
  AUTISM, DEVELOPMENTAL DISABILITIES, AND SEX OFFENSES
  (Lawrence A. Dubin & Emily Horowitz eds., 2017) .............*passim*

Gary Mesibov & Melisa Sreckovic,
  *Child and Juvenile Pornography and Autism Spectrum Disorder*,
  *in* CAUGHT IN THE WEB OF THE CRIMINAL JUSTICE SYSTEM:
  AUTISM, DEVELOPMENTAL DISABILITIES, AND SEX OFFENSES
  (Lawrence A. Dubin & Emily Horowitz eds., 2017) .............*passim*

John Douard & Pamela Schultz,
  *Asperger's Syndrome and Downloading Child Pornography*,
  *in* CAUGHT IN THE WEB OF THE CRIMINAL JUSTICE SYSTEM:
  AUTISM, DEVELOPMENTAL DISABILITIES, AND SEX OFFENSES
  (Lawrence A. Dubin & Emily Horowitz eds., 2017) ................... 31

M.C. Mogavero,
  *Autism, Sexual Offending, and the Criminal Justice System*,
  7 J. INTELL. DISABILITIES & OFFENDING BEHAV. 116 (2016) ........ 36

Michael L. Perlin et al.,
  *"Some Things Are Too Hot to Touch": Competency, the
  Right to Sexual Autonomy, and the Roles of Lawyers
  and Expert Witnesses*,
  35 TOURO L. REV. 405 (2019) ..................................................... 41

Sentencing Data in Autism-Related Child Pornography Cases,
  *United States v. Huseth*,
  No. 2:18-cr-20027, ECF No. 67 (D. Kan. June 18, 2021) ............. 52

U.S. Sent'g Comm'n,
  2023 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS (2024) .. 50

U.S. Sent'g Comm'n,
  *Federal Sentencing of Child Pornography:
  Non-Production Offenses* (2021) ........................................... 27, 54

U.S. Sent'g Comm'n,
  *Interactive Data Analyzer* ................................................... 28, 50

U.S. Sent'g Comm'n,
  *Judicial Sentencing Information (JSIN)* ..................................... 50

# JURISDICTION

This is an appeal from a final judgment in a criminal case alleging violations of federal law. The district court had jurisdiction under 18 U.S.C. § 3231. The district court entered its judgment on July 23, 2024. ROA.547. Thomas appealed the next day. ROA.556; *see* Fed. R. App. P. 4(b)(1)(A)(i). This Court has jurisdiction under 18 U.S.C. § 3742(a) and 28 U.S.C. § 1291.

## INTRODUCTION

Within moments of meeting Thomas Perkins, you realize that he is different. Thomas was born with autism spectrum disorder, a neurological developmental disorder that impacts nearly every aspect of his life. It influences how he perceives and interacts with other people. During conversations, Thomas's eye contact is poor, his speech is monotone, and he has difficulty expressing emotions. And he struggles with recognizing social cues that most of us take for granted: facial expressions, tone of voice, and body language. Autism also affects his interests. Thomas can become intensely fixated on narrow topics, like computers and video games, and he enjoys collecting things.

Unfortunately, psychologists recognize that these characteristics of autism spectrum disorder can make autistic individuals, like Thomas, uniquely vulnerable to accessing child pornography online. Because of their social deficits, autistic individuals tend to have few friends and limited sexual experiences. So they often turn to the internet to learn about their sexuality in the privacy of their home. Once they do, their compulsivity can lead them to view child pornography. But autism clouds how they perceive that content. Because their emotional maturity is closer to that of a young child,

they do not appreciate the morally reprehensible aspects of what they are viewing. And because they struggle to view the world through the eyes of others, they cannot perceive the abuse taking place in the videos.

Across the country, individuals with autism spectrum disorder have faced serious child pornography charges and have confronted the harsh federal sentencing regime for those offenses. But courts overwhelmingly recognize that, in these unique and unfortunate circumstances, autism spectrum disorder mitigates a defendant's culpability. They also acknowledge that circumstances that might otherwise be considered aggravating factors—a large collection or particularly disturbing videos—can be explained by autism. Finally, courts realize that autistic individuals are vulnerable to bullying and victimization in prison. So sentencing courts generally punish autistic individuals much less severely than a typical child pornography defendant—and often impose no prison time at all.

The district court here took the opposite approach. The court sentenced Thomas to 30 years in prison—a variance of *more than 8 years* above the Guidelines and a sentence *more than double* the average sentence received by defendants without autism. Despite extensive evidence about autism spectrum disorder, the court made

only a passing reference to Thomas's mental health at sentencing. Instead, the court focused on several supposedly aggravating circumstances. But the court never connected the dots between those factors and autism. Although Thomas had a large collection of child pornography, compulsive collecting is a characteristic of autism. Thomas also downloaded disturbing videos, but undisputed expert testimony explained that he could not understand the abuse taking place. And the district court's conclusion that Thomas poses a danger to the public conflicts with both its own conclusion that he is not likely to harm a child and extensive research showing that autistic individuals are rarely dangerous.

Thomas got caught up in the perfect storm that child pornography can present for individuals with autism spectrum disorder. But the district court's 30-year sentence is far greater than necessary to punish Thomas for his conduct. This Court should hold that Thomas's sentence is substantively unreasonable.

## STATEMENT OF THE ISSUE

The district court sentenced Thomas to 30 years in prison, a variance of more than 8 years above the Guidelines range. The district court disregarded Thomas's autism spectrum disorder, relied

on supposedly aggravating factors inextricably linked to that condition, and created a drastic and unwarranted sentencing disparity with defendants convicted of similar conduct. None of the sentencing factors support such a significant variance. Is the sentence the district court imposed substantively unreasonable?

## STATEMENT OF THE CASE

**Thomas's background.** Thomas—who was in his late 20s when he committed his offense and is now in his early 30s—has led a difficult life. He has a long history of mental health conditions—including autism spectrum disorder—and he suffers from a painful physical disability. As a result, Thomas has trouble making friends, he struggled in school, he cannot work, and he is homebound.

*Autism spectrum disorder.* From an early age, Thomas was diagnosed with autism spectrum disorder. ROA.2316, 2498.[1] Autism spectrum disorder is a neurodevelopmental disorder defined by two "essential features": (1) "persistent deficits in social communication

---

[1] Autism spectrum disorder includes conditions such as Asperger's syndrome. ROA.1198. So although some of Thomas's earlier diagnoses refer to Asperger's syndrome, this brief refers to his condition as autism spectrum disorder.

and social interaction," and (2) "restricted, repetitive patterns of behavior, interests, or activities." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* (DSM-5) at 31, 50–55 (5th ed. 2013); *see* ROA.1198–99, 2320–21. These features are typically present from early childhood, and they limit or impair an individual's everyday functioning. DSM-5 at 50–53. Thomas exhibits both essential features of autism spectrum disorder.

The first feature of autism spectrum disorder is difficulty with social communication and social interaction. ROA.1198; DSM-5 at 50, 53–54. Individuals with autism struggle to interpret emotions, facial expressions, and other social cues. ROA.1213, 2322; DSM-5 at 50, 54. They can have trouble maintaining eye contact, may speak in a monotone voice, and tend to be awkward in social situations. ROA.1199; DSM-5 at 50, 53–54. These social deficits often lead to "problems developing and maintaining social relationships." ROA.1198. So autistic individuals tend to live solitary lives and rarely have the opportunity to develop romantic or sexual relationships. ROA.1206–07.

Thomas displays these difficulties with social interaction. When talking with other people, he has poor eye contact, monotone speech, limited emotional expression, and difficulty staying on topic.

ROA.1199–1200, 2317–18, 2321. He also has "significant difficulties in social awareness," so he may "misperceive social cues" and "fail to understand sarcasm or jokes." ROA.2322, 2338. Thomas is a self-described "loner" who dislikes being around other people. ROA.2315, 2347. And despite "constantly wanting a girlfriend," he has never had a romantic relationship or explored his sexuality with anyone. ROA.1207–08, 2314.

The second feature of autism spectrum disorder is repetitive patterns of behavior, interests, or activities. ROA.2321; DSM-5 at 50, 54. Sometimes these can be repetitive motor movements, like hand flapping. ROA.1212; DSM-5 at 54. Many people with autism like to collect things. ROA.1211. They often "collect things for no apparent reason other than the fact that they want to have a collection of something, and they want to organize it by some characteristic." ROA.1211–12. And because they often insist on sticking to strict routines, autistic individuals can become frustrated if their routine is disrupted. ROA.1210; DSM-5 at 54.

Again, Thomas demonstrates symptoms related to repetitive interests and behaviors. He makes repetitive hand movements while talking to people. ROA.2338. He also prefers consistency in his routine and struggles with adjusting to change. ROA.2321. For

7

example, Thomas had a specific and lengthy shower routine as a teenager. ROA.2345. When there was not enough time to complete the entire routine, he would simply skip showering despite the resulting hygiene problems. ROA.2345. Thomas can also become fixated on narrow interests (such as computers and video games) and behaviors (like downloading files from the internet). ROA.677–78, 1200, 2220, 2223, 2314; *see infra* 10–12.

*Other mental health conditions.* Besides autism spectrum disorder, Thomas has been diagnosed with several other conditions affecting his cognitive functioning and mental health, including schizophrenia, depressive disorder, generalized anxiety disorder, and attention-deficit/hyperactivity disorder. ROA.2339, 2345, 2498. As a result of autism spectrum disorder and these other mental health conditions, Thomas spent most of his childhood under the care of psychiatrists. ROA.2498.

*Physical limitations.* Thomas also has physical limitations. He was born with a bone disorder called multiple hereditary exostosis. ROA.2345, 2499. This condition causes extra bone growths, and Thomas has endured over a dozen surgeries—as a child and as an adult—to remove the growths. ROA.2345, 2498. The condition

restricts movement near the joints, so his movements are impaired and walking long distances is painful. ROA.2345–46, 2498.

*Struggles in school.* Thomas struggled in school both academically and behaviorally. ROA.2498–99. He often fell behind in his schoolwork, he found it difficult to make friends, and he was bullied because he was different. ROA.2498. He felt depressed as a teenager and experienced social anxiety. ROA.2336, 2345. During middle school, Thomas was hospitalized for a week after he told his parents he planned to attempt suicide. ROA.2237, 2336, 2498. He was almost kicked out of high school before being allowed to graduate. ROA.2498. And although he took a few courses at a technical school, he never received a degree. ROA.2238, 2498.

*Hardships as an adult.* Thomas has never been able to function well enough to even apply for a job—much less hold down a job—so he received Social Security disability benefits. ROA.586–87, 2335, 2498–99. Even as an adult in his late 20s, he still lived with his parents. ROA.585–86, 2499. He is homebound without a car or a driver's license. ROA.2220, 2499. As noted above, he has never had a romantic relationship or any sexual experience despite wanting a girlfriend. *See supra* 7. And he has little interest in developing connections or relationships with other people. ROA.2347.

9

**Offense conduct.** Because Thomas had no friends and rarely left the house, he became addicted to computers. ROA.1005–06, 2219–20. He "loved technology and spent all of his money on new computer devices." ROA.2220. In particular, Thomas was addicted to downloading content from the internet. ROA.1006. He "liked downloading stuff and watching it upload and download for the sake of watching it." ROA.1006. So he searched for "basically everything that he possibly could." ROA.1045. Using BitTorrent—a peer-to-peer file sharing network that lets users download and share files with other users—he ran extremely broad searches. ROA.2217–18, 2222–23. He searched for terms such as "image" or "jpg" (a common type of image file). ROA.2223. Once he had collected immense amounts of information, he would sort through it and decide what he wanted to keep and what he wanted to get rid of. ROA.964, 2223. In short, Thomas "enjoyed searching," and "he enjoyed the downloading and uploading." ROA.964.

At some point, Thomas encountered child pornography on the internet. And he became obsessed with the distinction between child pornography and child nudity based on his understanding that child nudity was legal under Supreme Court precedent. ROA.968, 2223, 2352. So he began an "experiment[ ]," conducting

10

his own "research" by "download[ing] a bunch of stuff" and "try[ing] to figure out what was legal and what was not." ROA.2223, 2352. This ill-conceived experiment led Thomas to search for and download tens of thousands of images and videos containing illegal child pornography. ROA.2225.

The default for most peer-to-peer file-sharing networks like BitTorrent is to share the content in a shared folder with other users. ROA.921–23. Because Thomas did not disable this sharing feature on his BitTorrent account, government agents downloaded multiple files containing suspected child pornography from his parents' IP address in late 2019. ROA.2217–18, 2223. Soon after, officials obtained a search warrant for his parents' house (where he lived) and seized several of Thomas's computers and hard drives, which contained child pornography. ROA.2224–25.

While agents were searching his parents' house, other agents interrogated—and polygraphed—Thomas. ROA.2221–24. They had no training in questioning autistic individuals. ROA.1051. When asked about the material on his computers involving underage children, Thomas asserted that he had "been meaning to clear all that stuff out." ROA.2222. He acknowledged that he used VPN applications, or virtual private networks, to protect his identity

online. ROA.2223–24. Thomas stated that he was aroused by some of the content, particularly "nudist" content depicting children between 8 and 10 years old. ROA.969, 2223–24. He also said that he had masturbated to underage "nudist" content, although not for over a year. ROA.2223. In response to a hypothetical posed by the agents, Thomas admitted that he would be willing to have sex with a 12- or 13-year-old child, but only if the child prompted the encounter and they had a secure environment. ROA.1058, 2224. He also confirmed that he had not acted on that desire and that he would not harm a child. ROA.1055–56, 2224. Finally, Thomas told agents that he had accidentally touched a girl's chest while roughhousing at a church event a few years earlier, an encounter that he denied was sexual but apparently upset the girl. ROA.2224.

**Indictment.** The second superseding indictment charged Thomas with nine counts. ROA.359–66. Count one charged Thomas with distributing child pornography in violation of 18 U.S.C. § 2252A(a)(2). ROA.359. Counts two through nine charged Thomas with possessing different computers or hard drives containing child pornography in violation of 18 U.S.C. § 2252A(a)(5)(B). ROA.359–63.

**Competency concerns.** Thomas was represented by several attorneys in the district court, and each attorney expressed serious

concerns about whether he was competent to stand trial. *See, e.g.*, ROA.147–48, 2329–32. In particular, counsel explained that Thomas suffered from schizophrenia and believed that two "angels" whose voices he hears would suddenly release him from jail. ROA.2395–2404. Because of these concerns, three psychologists evaluated Thomas and submitted reports to the district court: Dr. Lacie Biber, Dr. James Schutte, and Dr. Samuel Browning. *See* ROA.2312–23 (Dr. Biber's report), 2335–40 (Dr. Schutte's report), 2343–54 (Dr. Browning's report). The psychologists disagreed about whether Thomas has schizophrenia and whether he was competent to stand trial. *Compare* ROA.2321–23, 2348–50, *with* ROA.2339–40. But the psychologists all agreed on one thing: Thomas has autism spectrum disorder. ROA.2320–21, 2338–39, 2347–48.

After a competency hearing at which Dr. Schutte and Dr. Browning testified, the district court found that Thomas was competent to stand trial. ROA.233–34.

**Plea negotiations.** Thomas refused to consider a plea agreement because he did "not want to sentence himself," even though he recognized that a plea agreement would lead to a lower sentence. ROA.2337. Indeed, the government offered to let Thomas plead guilty to only the distribution charge (count one). ROA.431.

That charge has a 20-year maximum sentence. *See* 18 U.S.C. § 2252A(a)(2), (b)(1). But Thomas was "incapable" of even discussing this or any other plea agreement. ROA.431.

**Trial.** Because the district court found him competent and he refused to consider a plea agreement, the only option left was for Thomas to go to trial. The government called several agents involved in the investigation to testify and introduced videos found on each of Thomas's devices. Thomas called Dr. Schutte as an expert witness. *See* ROA.1193–1233. Dr. Schutte testified about autism spectrum disorder generally and his diagnosis of Thomas specifically. Dr. Schutte confirmed his autism diagnosis based on his interaction with Thomas and the results of several tests. ROA.1199–1202. Dr. Schutte also described how Thomas downloaded child pornography "without seeing the entire picture" and explained that Thomas could not understand the feelings of the children in the videos he viewed. ROA.1212–13.

After a two-day trial, the jury found Thomas guilty on all nine counts. ROA.401–03.

**Presentence report.** Before sentencing, probation prepared a presentence report. ROA.2205–44. The report calculated Thomas's base offense level as 22. ROA.2233; *see* U.S.S.G. § 2G2.2(a)(2). The

report added two levels because the material involved prepubescent children (*see* U.S.S.G. § 2G2.2(b)(2)), two levels for distribution (*see id.* § 2G2.2(b)(3)(F)), four levels for material portraying sadistic or masochistic conduct and abuse of infants or toddlers (*see id.* § 2G2.2(b)(4)), two levels because the offense involved a computer (*see id.* § 2G2.2(b)(6)), and five levels because the offense involved 600 or more images (*see id.* § 2G2.2(b)(7)(D)). ROA.2233–35. Thomas has no criminal history. ROA.2235–36. So a total offense level 37 and criminal history category I produced an advisory Guidelines range of 210 to 240 months' imprisonment. ROA.2239. Probation identified no aggravating factors justifying a sentence outside that range. ROA.2244.

**Initial sentencing.** At sentencing, Thomas argued at length for a downward variance. ROA.1350–62, 2476–82. *First*, Thomas explained that the guideline for non-production child pornography offenses, U.S.S.G. § 2G2.2, is particularly harsh. ROA.2477–78. He noted that he was facing a greater Guidelines range than he would have if he had used the internet to entice a child across state lines and then sexually abused the child. ROA.2478. *Second*, Thomas asserted that autism spectrum disorder mitigated his culpability. ROA.2478–80. He explained that because of his social deficits, he

had no sexual experience. ROA.2479. And once he accessed child pornography, autism led him to obsessively collect the material. ROA.2479–80. *Finally*, Thomas argued that significant prison time was unnecessary because he posed little risk to the public, any future criminal conduct could be prevented by supervised release conditions, and autism would make him vulnerable in prison. ROA.2480–82.

The government, by contrast, urged the district court to impose a sentence at the high end of the Guidelines or to impose an upward variance. ROA.1370–71. The government also suggested running the sentences on each count consecutively. ROA.1373.

The district court—with no explanation—sentenced Thomas to 210 months on each of the nine counts to run consecutively, resulting in a total sentence of 1,890 months (or 157 and a half years). ROA.1377; *see* ROA.437. The district court also imposed a life term of supervised release. ROA.1378–79; *see* ROA.438–39.

**First appeal.** Thomas appealed the district court's competency determination and its sentence. Although this Court acknowledged that "Thomas has undeniable mental issues," it noted that psychologists came to different conclusions about whether he has schizophrenia and whether that condition rendered him

incompetent to stand trial. *United States v. Perkins*, 99 F.4th 804, 808, 812–816 (5th Cir. 2024). So the Court affirmed the district court's conclusion that Thomas was competent to stand trial. *Id.* at 816. But the Court vacated Thomas's sentence because the district court failed to explain its 137-year variance from the Guidelines. *Id.* at 816–21. And because the Court held that the district court procedurally erred in imposing the sentence, it did not reach whether the sentence was substantively reasonable. *Id.* at 816.

**Thomas's prison experience.** Thomas has struggled to adjust to life in prison. When Thomas arrived at a Bureau of Prisons facility for a psychological evaluation, he had "difficulty with adjustment to the routine on the unit." ROA.2317. And when he arrived at a different BOP facility after sentencing, he was attacked by another inmate. ROA.2562. His glasses were taken during the incident, he received a cut above his eye, and he had to spend the night in the prison hospital. ROA.2562.

**Resentencing.** On remand, the district court used the same presentence report. ROA.1401–02. Yet the district court adopted an advisory Guidelines range of 210 to 262 months, ROA.1403, instead of the 210–240 range in the report, ROA.2239. Although the district

court never explained why it adopted a higher Guidelines range, both parties agreed with the new range. ROA.1404.

Thomas again argued at length for a downward variance. ROA.1404–09, 1414–16, 2552–60. *First*, Thomas focused on how autism spectrum disorder impacted his offense. ROA.2556–58. He noted that autistic individuals commonly engage in compulsive behaviors such as collecting, which helps explain why he amassed such a large collection of child pornography. ROA.2556–57. He also explained that he could not understand the harm being done to the victims depicted in the videos he downloaded. ROA.2557. And he explained that autism makes prison daunting (because he prefers consistency in his routines) and dangerous (because his social deficits may subject him to bullying). ROA.2557–58. He noted that, consistent with these concerns, he had already been attacked by another inmate. ROA.1409, 2558. *Second*, Thomas explained that even a within-Guidelines sentence would result in a drastic sentencing disparity under the harsh guideline for non-production child pornography offenses. ROA.1408–09, 2554–56. *Third*, he explained that the circumstances of his offense were quite typical. ROA.2558. *Finally*, Thomas argued that he poses little danger

18

because he has never harmed a child and would not have an opportunity to do so because he is homebound. ROA.1407, 2559.

The government opposed Thomas's request for a downward variance. ROA.1410–11. The government expressed concern about his statement that he would have sex with a child if given the opportunity and pointed to the large quantity of child pornography that Thomas downloaded. ROA.1411–14.

In imposing its sentence, the district court briefly mentioned Thomas's mental health issues, acknowledging that "they are vast, and they are many." ROA.1418. But the court determined that it could not "wall that off and consider only that." ROA.1418. The court explained that the sentence should account for the "substantial number of images" Thomas downloaded and for the disturbing content depicted by many of those videos. ROA.1419–26. The court also believed that Thomas poses a "danger to the public." ROA.1428. The court noted Thomas's admission that he would have sex with a child as young as 12 years old if given the opportunity, although the court agreed that this scenario was "not likely to happen." ROA.1426–27. The court also noted Thomas's statement that he had touched a girl's chest while roughhousing with her. ROA.1427. Based on these "aggravating circumstances," the court

19

concluded that a "significant upward variance is appropriate." ROA.1418, 1429.

The district court imposed a total sentence of 360 months' imprisonment—240 months on counts one through eight (to run concurrently) and 120 months on count nine (to run consecutively). ROA.1430; *see* ROA.549. The court also imposed a life term of supervised release, including several special conditions. ROA.1430–31; *see* ROA.550. In particular, Thomas must participate in a mental health treatment program, he is not allowed to have contact with any child or go any place where children are likely to be, and he is prohibited from using computers or accessing the internet without his probation officer's permission. ROA.550–51.

Thomas objected to the 30-year sentence as unreasonable. ROA.1432. He argued that all the aggravating factors the district court cited are either covered by the Guidelines or explained by Thomas's mental health conditions. ROA.1432–33.

## SUMMARY OF THE ARGUMENT

Starting from the harsh guideline for non-production child pornography offenses—a guideline that sister circuits have criticized as draconian, irrational, and harsher than necessary—

20

the district court imposed an 8-year upward variance. The district court's severe 30-year sentence is substantively unreasonable for four independent reasons.

*First*, the district court disregarded Thomas's autism spectrum disorder, a neurodevelopmental disorder that impacts nearly every aspect of his life. Autism contributed to his offense conduct by making Thomas vulnerable to accessing child pornography. And autism makes a long prison term especially daunting and dangerous for Thomas, something he already experienced firsthand when another inmate attacked him. The district court never grappled with how autism spectrum disorder mitigates Thomas's culpability and puts his life at risk in prison.

*Second*, the district court placed unjustifiable weight on supposedly aggravating factors that are directly connected to autism spectrum disorder. For example, Thomas no doubt had a large collection of child pornography. But this kind of compulsive collecting is a common feature of autism spectrum disorder. Thomas also had videos depicting disturbing content. But autism spectrum disorder prevented him from perceiving the abuse taking place in those videos. And although Thomas admitted during a polygraph that he would have sex with a child if the child initiated the

21

encounter, autistic individuals are rarely dangerous because they lack the social skills to exploit a child and they rigidly follow rules they understand, like conditions of supervised release.

*Third*, the district court created a drastic—and unjustified—sentencing disparity. Thomas's sentence is *more than double* the average sentence received by defendants convicted of non-production child pornography offenses. And the disparity is even more dramatic when compared to defendants with autism spectrum disorder. Courts routinely grant significant *downward* variances—and often impose no prison time—for autistic defendants because their neurological condition mitigates their culpability. By contrast, the district court here imposed a substantial *upward* variance.

*Fourth*, the district court clearly erred in balancing the sentencing factors. None of the sentencing factors justify a variance of more than 8 years above an already harsh guideline. In fact, most of the factors support a significant *downward* variance.

For any—or all—of these reasons, this Court should hold that Thomas's sentence is substantively unreasonable and remand for the district court to impose a lower sentence.

## STANDARD OF REVIEW

This Court reviews whether a sentence is reasonable under an abuse-of-discretion standard. *Gall v. United States*, 552 U.S. 38, 51 (2007). "When conducting this review, the court will, of course, take into account the totality of the circumstances, including the extent of any variance from the Guidelines range." *Id.*

## ARGUMENT

**Thomas's sentence is substantively unreasonable.**

The sentence the district court imposed—an 8-year variance above an already harsh guideline—would be unreasonable even if Thomas were a typical defendant. After all, other defendants convicted of non-production child pornography offenses receive an average sentence *less than half* the sentence Thomas received. But the district court's failure to grapple with Thomas's autism spectrum disorder—and the court's reliance on supposedly aggravating factors related to that condition—makes the 30-year sentence indefensible. This Court should vacate Thomas's sentence and remand for resentencing.

## A. Anchored by the advisory Guidelines range, a sentence must be no greater than necessary to comply with the statutory sentencing factors.

"It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007). Consistent with this tradition, "[f]ederal sentencing law requires the district judge in every case to impose 'a sentence sufficient, but not greater than necessary, to comply with' the purposes of federal sentencing." *Freeman v. United States*, 564 U.S. 522, 529 (2011) (quoting 18 U.S.C. § 3553(a)).

For all sentencing proceedings, the Guidelines are the district court's "starting point and the initial benchmark." *Gall*, 552 U.S. at 49. Because the Guidelines "anchor … the district court's discretion," the court must "remain cognizant of them throughout the sentencing process." *Peugh v. United States*, 569 U.S. 530, 541, 549 (2013). The court must then consider the sentencing factors in 18 U.S.C. § 3553(a) to make an individualized assessment and decide whether the facts of the case warrant an outside-Guidelines sentence. *Gall*, 552 U.S. at 49–50. "The farther a sentence varies from the applicable

24

Guidelines sentence, the more compelling the justification based on factors in section 3553(a) must be." *United States v. Hebert*, 813 F.3d 551, 562 (5th Cir. 2015) (cleaned up). In the "usual sentencing," however, the court will "impose a sentence within the [Guidelines] range." *Freeman*, 564 U.S. at 529.

Although appellate courts defer to a district court's determination that the § 3553(a) factors justify a variance, *Gall*, 552 U.S. at 51, "the sentencing court's discretion is not unlimited," *United States v. Hudgens*, 4 F.4th 352, 358 (5th Cir. 2021). "A non-Guidelines sentence unreasonably fails to reflect the statutory sentencing factors set forth in § 3553(a) where it (1) does not account for a factor that should have received significant weight, (2) gives significant weight to an irrelevant or improper factor, or (3) represents a clear error of judgment in balancing the sentencing factors." *United States v. Diehl*, 775 F.3d 714, 724 (5th Cir. 2015).

## B. The district court's 30-year sentence—including an 8-year variance above an already harsh Guidelines range—is far greater than necessary.

The district court abused its discretion by imposing an over 8-year variance above an already harsh Guidelines range. *First*, the district court disregarded Thomas's autism spectrum disorder.

*Second*, the district court placed unjustifiable weight on supposedly aggravating factors that are directly connected to that condition. *Third*, the district court created a drastic sentencing disparity between Thomas and other defendants convicted of similar offenses. *Finally*, the district court clearly erred in balancing the sentencing factors because none of them support such a harsh sentence. On any of these grounds, this Court should hold that the district court's sentence is substantively unreasonable.

### 1.    As a starting point, the non-production child pornography guideline is particularly harsh because of escalating enhancements.

As noted above, the Guidelines are the "starting point" for any sentence, *Gall*, 552 U.S. at 49, and one of the sentencing factors that courts must consider, 18 U.S.C. § 3553(a)(4)(A). For Thomas, the Guidelines recommended a severe sentence—210 to 262 months in prison. *See* ROA.1403.

Courts have criticized the non-production child pornography guideline that Thomas was sentenced under—U.S.S.G. § 2G2.2—as being "harsher than necessary," *United States v. Stone*, 575 F.3d 83, 97 (1st Cir. 2009), and "irrational[ ]," *United States v. Dorvee*, 616 F.3d 174, 187 (2d Cir. 2010). Most guidelines are developed by the

Sentencing Commission using an empirical data-based approach. *See Rita v. United States*, 551 U.S. 338, 349 (2007). By contrast, § 2G2.2 includes enhancements "cobbled together" by Congressional directives. *Dorvee*, 616 F.3d at 184–86 (reciting history). Many of these enhancements—using a computer, the victim's age, sadistic content, and the number of images (which all applied to Thomas and caused his Guidelines range to skyrocket, *see* ROA.2233–35)—"cover conduct that has become so ubiquitous that they now apply in the vast majority of cases." U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography: Non-Production Offenses* 4 (2021). So even run-of-the-mill cases result in Guidelines ranges near or exceeding the statutory maximum "based solely on sentencing enhancements that are all but inherent to the crime of conviction." *Dorvee*, 616 F.3d at 186–87. And § 2G2.2 often recommends much longer sentences for non-production child pornography offenders than the applicable guideline recommends for someone who entices a preteen online, arranges a meeting, and sexually abuses the child. *Id.* at 187 & n.11.

As a result, "most courts believe § 2G2.2 is generally too severe and does not appropriately measure offender culpability in the typical non-production child pornography case." U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography*, *supra*, at 22.

27

And because § 2G2.2 is so harsh, most defendants receive a *below-Guidelines* sentence. U.S. Sent'g Comm'n, *Interactive Data Analyzer*, https://ida.ussc.gov/analytics/saw.dll?Dashboard.

To be clear, Thomas is not arguing that *any* sentence imposed under § 2G2.2 is inevitably unreasonable. *See United States v. Miller*, 665 F.3d 114, 121 (5th Cir. 2011) (affirming within-Guidelines sentence under § 2G2.2 and explaining that, "[e]mpirically based or not, the Guidelines remain the Guidelines"). But § 2G2.2 is an unusual guideline that, "unless carefully applied, can easily generate unreasonable results." *Dorvee*, 616 F.3d at 188. And as the starting point of the district court's analysis, it is relevant that applying § 2G2.2 alone—before any variance or departure—often results in "draconian" sentencing ranges. *United States v. Grober*, 624 F.3d 592, 596 (3d Cir. 2010). The district court took an already harsh guideline and sentenced Thomas to nearly a decade longer than the top of the Guidelines range.

### 2. The district court disregarded Thomas's autism spectrum disorder, which mitigates his culpability and makes prison daunting.

The district court's sentence disregards a factor that should have received significant weight: Thomas's autism spectrum disorder. At

28

sentencing, the court briefly noted—in a single sentence—Thomas's "mental health issues," acknowledging that "they are vast, and they are many." ROA.1418. But the court never grappled with how autism spectrum disorder contributed to Thomas's offense conduct—and mitigates his culpability—by leaving him uniquely vulnerable to accessing child pornography. And the court ignored that autism would make any prison term—and especially a long one—daunting and dangerous for Thomas.

### a. Characteristics of autism spectrum disorder make individuals like Thomas uniquely vulnerable to accessing child pornography.

Psychologists recognize that child pornography can present a "perfect storm" for individuals with autism spectrum disorder. Gary Mesibov & Melisa Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder*, *in* CAUGHT IN THE WEB OF THE CRIMINAL JUSTICE SYSTEM: AUTISM, DEVELOPMENTAL DISABILITIES, AND SEX OFFENSES, 64 (Lawrence A. Dubin & Emily Horowitz eds., 2017). Several neurodevelopmental characteristics related to the condition make autistic individuals uniquely vulnerable to accessing child pornography. Those characteristics both contributed to Thomas's offense conduct and mitigate his culpability.

As discussed above, individuals with autism spectrum disorder have significant deficits in social communication and interaction. *See supra* 6; DSM-5 at 50, 53–54. Because of these social deficits, autistic individuals have "very limited social and sexual experiences." Mesibov & Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder, supra*, at 64. They do not have the opportunity to "casually learn about sexuality from their peers." *Id.* at 71. And "their eccentric or odd behavior more often repels rather than attracts a potential sexual partner." Dennis P. Sugrue, *Forensic Assessment of Individuals on the Autism Spectrum Charged with Child Pornography Violations, in* CAUGHT IN THE WEB OF THE CRIMINAL JUSTICE SYSTEM, *supra*, at 117. Not surprisingly, studies show that autistic individuals have "lower levels of sexual experience" than individuals with typical neurological development and functioning. Christine N. Cea, *Autism and the Criminal Defendant*, 88 ST. JOHN'S L. REV. 495, 503 (2014).

But "despite being incorrectly viewed as sexually immature due to limited experience, autistic individuals are interested in their sexuality, romantic relationships, and marriage." *Id.* at 514. Indeed, the intensity of their sexual interest is similar to that of neurotypical individuals. Sugrue, *Forensic Assessment of Individuals on the*

30

*Autism Spectrum Charged with Child Pornography Violations*, *supra*, at 116–17. They just have "few sexual outlets." John Douard & Pamela Schultz, *Asperger's Syndrome and Downloading Child Pornography*, *in* CAUGHT IN THE WEB OF THE CRIMINAL JUSTICE SYSTEM, *supra*, at 309.

So autistic individuals often turn to computers to "learn about sexuality in the privacy of their own homes." Mesibov & Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder*, *supra*, at 64. Computers are "irresistible" to individuals with autism spectrum disorder because they "provide an avenue to communicate and socialize with other people, which can be extremely challenging for them in person." *Id.* at 68. In other words, the internet gives them a way to engage with others in a setting where their social deficits are not so apparent. *Id.* at 68–69. When they explore their sexuality on the internet, "[t]hey encounter pornography that excites them and provides them with satisfaction, without risking the ridicule and rejection that can occur in real life." Sugrue, *Forensic Assessment of Individuals on the Autism Spectrum Charged with Child Pornography Violations*, *supra*, at 117. And "their compulsivity will lead them to extreme sexual content including, in many cases, child pornography." *Id.*

31

But autism spectrum disorder clouds their perception of the child pornography they come across. Autistic individuals are "typically delayed by at least five years in their sexual and social-emotional maturity." Mesibov & Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder*, *supra*, at 64. So "despite their average intelligence and biological development for their age," they are often interested in learning about children closer to their social-emotional age. *Id.* at 76–78. Someone with the "psycho-sexual maturity of a 10- or 12-year-old" may "find[ ] it natural to focus on minors." Sugrue, *Forensic Assessment of Individuals on the Autism Spectrum Charged with Child Pornography Violations*, *supra*, at 118. In addition, the "demarcation between observing an adult and observing a child is often unclear" for autistic individuals. Mesibov & Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder*, *supra*, at 76. "And given their characteristic lack of empathy and inability to discern what other people are thinking or feeling, they have little or no awareness of what reality lurks behind the pictures and videos—that real children are experiencing horrible abuse." Sugrue, *Forensic Assessment of Individuals on the Autism Spectrum Charged with Child Pornography Violations*, *supra*, at 118.

32

Autism not only impacts how these individuals perceive the child pornography they view, but it also impacts their collecting behavior more generally. Autistic individuals often become "obsessed with accumulating large amounts" of pornography and "downloading as many files as they can." Mesibov & Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder*, *supra*, at 75–76. And individuals with autism spectrum disorder can "collect files and pass them on to others without realizing that is what they are doing because they often are narrowly focused on the complicated computer activities that they are initiating and the large amount of data they are collecting, and not on the larger issue that the files they are accumulating might be passed on to other people." *Id.* at 75.

Thomas's case mirrors this common fact pattern. It is undisputed that Thomas has autism spectrum disorder. He was diagnosed with autism at an early age, ROA.2498, and every psychologist who evaluated him during this case agreed with that diagnosis, ROA.2320–21, 2238–39, 2347–48. Like most individuals with autism spectrum disorder, Thomas struggles to make friends. ROA.2498. He is a self-described "loner," ROA.2315, and he has never had a romantic relationship or explored his sexuality with

33

anyone, ROA.1207–08, 2314. Although he is in his mid-30s, he has never even kissed someone. ROA.1208. And the lack of a romantic relationship is not for a lack of interest. Thomas has "constantly want[ed] a girlfriend." ROA.2314. But his social deficits made it impossible. Thomas also—again, like many autistic individuals—became attached to computers. ROA.677–78, 2200, 2314.

Because he was socially isolated but comfortable with computers, it is hardly surprising that Thomas turned to the internet to learn about his sexuality. And once he did, he downloaded child pornography "without seeing the entire picture." ROA.1213. For example, Thomas's social deficits prevented him from understanding the abuse taking place in the videos he downloaded. ROA.1213. And Thomas's compulsive nature led him to become "addicted" to downloading images, often just for the sake of watching them upload and download. ROA.1006. He also became obsessed with a narrow, idiosyncratic topic: the distinction between child pornography and child nudity. ROA.968, 2223, 2352. Finally, although Thomas was aware that the sharing feature on his peer-to-peer network was turned on by default, ROA.971, he also acknowledged that he was not distributing child pornography intentionally, ROA.1055.

The district court's passing reference to Thomas's "mental health issues" (ROA.1418) disregarded how autism spectrum disorder influenced Thomas's offense conduct—just like it affects nearly every aspect of his life. Courts across the country considering similar cases recognize that autism spectrum disorder contributes to a defendant's offense conduct and diminishes his culpability. *See, e.g.*, *United States v. Knott*, 638 F. Supp. 3d 1310, 1317, 1320 (M.D. Ala. 2022) ("Knott's ASD contributed to his offense conduct" and "diminished his moral culpability"); *United States v. Huseth*, 2021 WL 4940915, at *10 (D. Kan. Oct. 22, 2021) (explaining that autism spectrum disorder "substantially contributed to the commission of the offense"); *United States v. Mallatt*, 2013 WL 6196946, at *14 (D. Neb. Nov. 27, 2013) (explaining that defendant's autism spectrum disorder "undoubtedly contributed to his actions and must be considered in determining his culpability"); *see also United States v. Shore*, 2020 WL 3791550, at *4 (E.D. Pa. July 7, 2020) ("Shore's ASD is a component of the culpability analysis. It bears on his perspective and appreciation of the wrongfulness of his offense conduct.").

So too here. Autism does not absolve Thomas of culpability. But it mitigates his culpability because "much of the deviant or sexual offending behavior exhibited among those with ASD is often a

manifestation of their ASD symptoms and not malice." M.C. Mogavero, *Autism, Sexual Offending, and the Criminal Justice System*, 7 J. INTELL. DISABILITIES & OFFENDING BEHAV. 116, 116 (2016). And defendants, like Thomas, whose crimes are driven by a mental health condition do not "deserve as much punishment as those who act maliciously or for gain." *See United States v. Chatman*, 986 F.2d 1446, 1452 (D.C. Cir. 1993) (cleaned up). After all, our society has a long-held belief that "defendants who commit criminal acts that are attributable to … mental problems may be less culpable than defendants who have no such excuse." *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989) (cleaned up).

There is an important postscript to this discussion. Although Thomas's autism spectrum disorder left him vulnerable to accessing child pornography, "individuals with ASD can be taught not to view and download child pornography." Mesibov & Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder*, *supra*, at 90. "Research has demonstrated that ASD individuals in general tend to adhere rigidly to rules they adequately understand." Sugrue, *Forensic Assessment of Individuals on the Autism Spectrum Charged with Child Pornography Violations*, *supra*, 129. Autistic individuals, however, "have unique learning needs; they are literal

thinkers and therefore require very direct and explicit instruction on what is and is not appropriate social and sexual behavior." Mesibov & Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder*, *supra*, at 72. So they need to be "explicitly and repeatedly taught how and why child pornography is illegal." *Id.* at 79. There is no reason to believe that Thomas would not respond to this kind of direct, specialized instruction.

### b. Prison is especially daunting and dangerous for autistic individuals, and Thomas has already been attacked by another inmate.

Autism spectrum disorder also makes a long prison term especially daunting and dangerous for Thomas. Psychologists recognize that autistic individuals are "far less psychologically equipped than a neurotypical individual to adopt to and survive in a jail or prison setting." Sugrue, *Forensic Assessment of Individuals on the Autism Spectrum Charged with Child Pornography Violations*, *supra*, at 133. They are more likely to be targeted for abuse, and the prison environment is more punitive for them than for prisoners with a better ability to adapt to new situations.

"In prisons, where domination and regulation among prisoners plays an important role in inmate survival, a socially fragile

individual such as one with ASD is an easy target for physical and sexual abuse." Mesibov & Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder*, *supra*, at 84. Autistic individuals' "direct manner, unusual behaviors, and characteristics are interpreted by others as invitations to exploit, bully, and control." *Id.* at 83. "Misinterpretation of unwritten social cues and rules may cause conflict between defendants with ASD and other prisoners, and potentially result in physical injuries." Colleen M. Berryessa, *Defendants with Autism Spectrum Disorder in Criminal Court: A Judges' Toolkit*, 13 DREXEL L. REV. 841, 862 (2021).

In addition, "[t]rouble with adaptive behavior can be particularly burdensome for an autistic individual in a prison setting, as adjusting to prison life in general is difficult for inmates, with or without disabilities." Cea, *Autism and the Criminal Defendant*, *supra*, at 526–27. And "confinement can be sufficiently stressful and disorienting to lead to decompensation, a possible psychotic break, or a suicide attempt." Sugrue, *Forensic Assessment of Individuals on the Autism Spectrum Charged with Child Pornography Violations*, *supra*, at 133.

These same concerns apply to Thomas. He has communication deficits that will hinder his interactions with other inmates and

prison staff. *See, e.g.*, ROA.1199–2000, 2322. And it is no longer theoretical that these characteristics may lead to him being bullied or victimized by other prisoners. They already have. Shortly after arriving at prison, Thomas was attacked by another inmate and he had to spend the night in the hospital. ROA.2562. In addition, Thomas prefers consistency in his routines and has difficulties adjusting to changes. ROA.2348. Not surprisingly, he has struggled to adjust to new routines in prison. ROA.2317. Finally, the possibility of decompensation or suicide is particularly concerning in Thomas's case because he has been diagnosed with psychotic disorders and has a history of threatening suicide. *See, e.g.*, ROA.2336, 2339.

The district court's cursory mention of Thomas's "mental health issues" (ROA.1418) ignored that autism spectrum disorder "renders him extraordinarily vulnerable to abuse in prison." *See Knott*, 638 F. Supp. 3d at 1320. And "[b]eing violently assaulted in prison is simply not part of the penalty that criminal offenders pay for their offenses against society." *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (cleaned up).

### 3. The district court placed unjustifiable weight on supposedly aggravating factors inextricably linked to autism spectrum disorder.

After briefly paying lip service to Thomas's mental health issues, the district court pivoted to discussing several "aggravating circumstances": Thomas's large collection of child pornography, the horrific content depicted in that collection, and the danger he poses to the community based on his admission that he would have sex with a child if the child prompted the encounter. ROA.1418–29. But the district court placed unjustifiable weight on these supposedly aggravating factors because they are all inextricably linked to Thomas's autism spectrum disorder. So the court exacerbated its error of failing to consider autism a *mitigating* factor by relying on autism-related factors as *aggravating* factors. And using these circumstances to justify a severe sentence risks punishing Thomas not for his crimes but for his neurodevelopmental disorder.

### a. Because compulsive collecting is a common symptom of autism, it is no surprise that Thomas had a large collection.

The first supposedly aggravating factor the district court discussed was the "large amount of child pornography" that Thomas downloaded. ROA.1424–25; *see* ROA.1416–19. That is true as a

40

factual matter. Thomas had a large collection. But the district court ignored that compulsive collecting is a common characteristic of autism spectrum disorder.

As discussed above, engaging in compulsive and repetitive collecting behaviors is an essential feature of autism spectrum disorder. *See supra* 7; DSM-5 at 54. Autistic individuals often collect things "for no apparent reason other than the fact that they want to have a collection of something" and "they want to organize it by some characteristic." ROA.1211–12. And they can develop restricted and intense absorption in "idiosyncratic" interests and then "collect volumes of detailed information on these narrow topics without necessarily having a genuine understanding of the broader area." Mesibov & Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder*, *supra*, at 73.

Unfortunately, "[t]his pattern of behavior can easily lead to fixating on pictures that would be inappropriate such as child pornography." Michael L. Perlin et al., *"Some Things Are Too Hot to Touch": Competency, the Right to Sexual Autonomy, and the Roles of Lawyers and Expert Witnesses*, 35 TOURO L. REV. 405, 428 (2019). Once individuals with autism spectrum disorder access child pornography, "they may become obsessed with accumulating large

41

amounts of it because of the compulsivity that accompanies most of their routines." Mesibov & Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder*, *supra*, at 75–76. And they can accumulate these large collections "without focusing on broader issues like where and how they got those files, who else has access to them, and what the implications might be for the children who are posing." *Id.* at 74.

That happened here. Thomas compulsively downloaded child pornography as part of an idiosyncratic "experiment[ ]." ROA.2352. Thomas became obsessed with "learning the differences between pornography and nudity" based on his understanding that, under Supreme Court precedent, it was legal to have images depicting only nudity. ROA.968, 2352; *see New York v. Ferber*, 458 U.S. 747, 765 n.18 (1982) (analyzing child pornography statute and explaining that "nudity, without more is protected expression"). So he "download[ed] a bunch of stuff … try[ing] to figure out what was legal and what was not." ROA.2223. Indeed, Thomas downloaded so much material that he had not even sorted through most of it. ROA.2222–23. In short, Thomas's "amassing of a large amount of material" and the "seemingly voluminous size of his collection" was

"due in part to symptoms that are characteristic of his autistic condition." *See Mallatt*, 2013 WL 6196946, at \*17–18.

### b. Although Thomas had videos portraying disturbing content, autistic individuals struggle to perceive the abuse taking place.

Next, the district court described "horrific and evil" conduct in the child pornography Thomas downloaded. ROA.1417, 1424–25. It is true that Thomas had disturbing videos and images. But the district court overlooked unrebutted expert testimony that autism spectrum disorder prevented Thomas himself from perceiving the horrific nature of those videos.

"In prosecuting child pornography cases, a critical premise is that the person viewing such images understands that the children might not have given informed consent for participating in the pictures and are being exploited and perhaps psychologically and physically abused." Mesibov & Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder*, *supra*, at 78. After all, when individuals without autism spectrum disorder see—or even contemplate—child pornography, we feel disgust and revulsion.

Individuals with autism spectrum disorder, however, struggle with interpreting emotions and facial expressions. *See supra* 6;

43

DSM-5 at 53–54. This "limited ability to empathize … makes it hard for them to intuit or understand how their viewing an image on the internet can be promoting the victimization of the child on the screen." Mesibov & Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder*, *supra*, at 77–78. So they "may look at child pornography but have no sense of the harm it is causing the child." Cea, *Autism and the Criminal Defendant*, *supra*, at 503. And although they "may cognitively understand that their behavior is considered illegal, they often still do not appreciate its social and emotional implications, especially for victims of their crimes." Berryessa, *Defendants with Autism Spectrum Disorder in Criminal Court*, *supra*, at 861.

So too with Thomas. Unrebutted expert testimony established that Thomas could not understand the abuse taking place in the child pornography he downloaded.[2] ROA.1213. And consistent with

---

[2] With proper, direct instruction, however, Thomas can learn that children involved in child pornography are being harmed. *See supra* 36–37; Mesibov & Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder*, *supra*, at 79 ("To understand that the children in the videos are being victimized, individuals with ASD need to be taught how to recognize verbal and nonverbal cues related to sexuality and understand what consent means and that it is always needed prior to any sexual behaviors.").

his inability to perceive the abusive nature of the videos, Thomas explained that he was "not trying to harm anybody" by downloading and viewing child pornography. ROA.2352. Possessing horrific content can hardly be considered an aggravating factor when Thomas lacked "a neurologically unimpaired person's ability to understand the horrible reality behind the child pornography he encountered." *See Knott*, 638 F. Supp. 3d at 1320.

### c. Thomas admitted that he had a sexual interest in children, but autistic individuals are rarely dangerous.

Finally, the district court determined that an upward variance was required because Thomas poses a "danger to the public." ROA.1426–28. The court noted Thomas's admission that he would have sex with a 12-year-old if the child initiated the encounter and they had a secure environment.[3] ROA.1426–27. Although the court

---

[3] Autism helps explain why Thomas even made such a detrimental admission in the first place. Autistic individuals are "brutally honest," ROA.1208–10, and "often truthful almost to a fault," Sugrue, *Forensic Assessment of Individuals on the Autism Spectrum Charged with Child Pornography Violations, supra*, at 127. So when confronted by law enforcement, they "will often volunteer answers to leading statements" and "may additionally share more information than individuals without ASD out of fear." Mesibov & Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder, supra*, at 81.

agreed that this scenario was "not likely to happen," the court still determined that children are "in danger of being exploited or sexually assaulted" if Thomas was not imprisoned. ROA.1427–28. But the district court failed to grapple with how autism makes it extremely unlikely that Thomas will ever harm a child.

*First*, "[p]eople with ASD who view child pornography are rarely dangerous to children." Mesibov & Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder*, *supra*, at 80. "Research tells us that individuals with ASD, whose only offense is child pornography, present far fewer risks of other forms of criminal activity compared with other sex offenders or sex offenders without ASD." *Id.* at 86–87 (collecting studies).

"Their likelihood of victimizing children is limited because their social awkwardness will not make them attractive to children and their naiveté will make them inept in any effort to manipulate a potential child victim." Sugrue, *Forensic Assessment of Individuals on the Autism Spectrum Charged with Child Pornography Violations*, *supra*, at 129–30. "Dangerous child pedophiles have skills that enable them to isolate children from their caregivers, build up trust, find children who are vulnerable in vulnerable situations, and then plan and execute complicated sequences to

46

separate, isolate, and abuse these children." Mesibov & Sreckovic, *Child and Juvenile Pornography and Autism Spectrum Disorder*, *supra*, at 80. Autistic individuals, however, "lack the pedophile's interpersonal skills and ability to deceive that are essential for physically separating and directly exploiting children." *Id.*

Thomas also lacks these skills. He has significant social deficits. *See supra* 6–7. He is shy, has social anxiety, and dislikes being around other people. ROA.2317, 2345–47, 2499–2500. Given that Thomas waits until after dark to take his trashcan to the curb just to avoid seeing anyone, ROA.2499, it is exceedingly unlikely that he would be able to groom a child. And Thomas will not have the opportunity to do so. He is homebound, he does not have a driver's license or a car, and walking long distances is painful because of his bone disorder. ROA.2499. Finally, Thomas confirmed that he would not harm a child. ROA.1055–56.

*Second*, Thomas is subject to strict supervised release conditions for the rest of his life that ensure that he will not harm children. Those conditions prohibit him from having direct contact with children or going anywhere he knows children are likely to be. ROA.550. And they bar him from possessing a computer or accessing the internet without his probation officer's permission.

47

ROA.550–51. Consistent with these conditions, his parents have committed to providing him housing "without internet of any kind." ROA.2500.

Autism spectrum disorder makes it highly likely that Thomas will comply with these supervised release conditions. "Research has demonstrated that ASD individuals in general tend to adhere rigidly to rules they adequately understand and are less likely to break the law compared with the general population." Sugrue, *Forensic Assessment of Individuals on the Autism Spectrum Charged with Child Pornography Violations, supra*, 129. Studies also show that individuals with autism are "significantly less likely to be charged with probation violations." Catherine A. Cheely et al., *The Prevalence of Youth with Autism Spectrum Disorders in the Criminal Justice System*, 42 J. AUTISM & DEV. DISORDERS 1856, 1859 (2012). There is no reason to believe that Thomas would be any different.

In short, the district court got it right when it concluded that Thomas was "not likely" to harm a child. ROA.1427.

### 4. The district court created a drastic and unwarranted sentencing disparity between Thomas and other defendants.

The district court's sentence also creates exactly the type of "unwarranted sentence disparit[y]" that Congress has instructed courts to avoid. *See* 18 U.S.C. § 3553(a)(6). And "this factor requires particular attention in the context of child pornography offenses, in light of the wide range of conduct that can constitute this type of offense, as well as the breadth of sentences authorized under the child pornography guidelines." *United States v. Killen*, 729 F. App'x 703, 717 (11th Cir. 2018) (holding sentence in child pornography case substantively unreasonable). Whether compared to non-production child pornography defendants generally or autistic defendants specifically, the drastic disparity between Thomas's sentence and sentences received by other defendants is unjustifiable.

### a. Thomas's sentence is more than double the average sentence received by non-production child pornography defendants.

Thomas received a radically higher sentence than other defendants convicted of non-production child pornography offenses. Over the last five years, defendants sentenced for non-production child pornography offenses under the same guideline (§ 2G2.2) with

49

the same offense level (37) and the same criminal history score (I) as Thomas have received an average sentence of 151 months. U.S. Sent'g Comm'n, *Judicial Sentencing Information (JSIN)*, http://jsin.ussc.gov/. By contrast, the district court sentenced Thomas to 360 months in prison. So Thomas's sentence is *more than double* the average sentence. And while nearly 75% of defendants receive a sentence *below* the Guidelines range, *id.*, Thomas received a substantial *upward* variance. Only a tiny fraction—about 2%—of defendants sentenced under § 2G2.2 receive an upward variance. *See* U.S. Sent'g Comm'n, *Interactive Data Analyzer*, *supra.*

The district court's sentence is not just severe when compared to other defendants convicted of non-production child pornography offenses. Thomas received 7 years more than the average sentence—272 months—for offenders sentenced under U.S.S.G. § 2G2.1 for *producing* child pornography. *See id.* And his sentence is much higher than the average federal sentence—285 months—for *murder*. *See* U.S. Sent'g Comm'n, 2023 SOURCEBOOK OF FEDERAL SENTENCING STATISTICS, Table 28 (2024).

So even before considering autism spectrum disorder, Thomas's sentence is wildly disproportionate compared to sentences received by defendants convicted of similar—or much worse—conduct.

### b. The divergence between Thomas's sentence and sentences received by individuals with autism is even more extreme.

Of course, Thomas is not similarly situated to most non-production child pornography offenders because he has autism spectrum disorder. And the disparity between his 30-year sentence and the sentences individuals with autism spectrum disorder receive for similar offenses is even more extreme.

When sentencing individuals with autism spectrum disorder who have been convicted of child pornography offenses, courts generally impose sentences far below the Guidelines.[4] One source collecting similar cases shows that autistic defendants receive more—and

---

[4] *See, e.g.*, *Knott*, 638 F. Supp. 3d 1310 (granting 78-month downward variance and sentencing defendant with autism to 27 months of home confinement); *Huseth*, 2021 WL 4940915 (granting 97-month downward variance and sentencing defendant with autism to a 5-year probation term); *Mallatt*, 2013 WL 6196946 (granting 10-year downward variance and imposing time-served sentence); *United States v. Zuk*, No. 5:13-cr-59 (W.D.N.C. Feb. 3, 2017) (sentencing autistic defendant to 71-month sentence—a 169-month downward variance—in child pornography production case); *United States v. Dubin*, No. 1:12-cr-20828 (E.D. Mich. June 20, 2013) (imposing one-day, time-served sentence—a 97-month downward variance—for autistic defendant); *United States v. Carpenter*, No. 6:08-cr-6256 (W.D.N.Y. June 17, 2009) (imposing probation for defendant with autism convicted of child pornography offenses); *United States v. Joy*, No. 1:07-cr-187 (N.D.N.Y. July 28, 2008) (imposing one-day, time-served sentence for defendant with autism).

larger—downward variances than those received by defendants generally. *See* Sentencing Data in Autism-Related Child Pornography Cases, *United States v. Huseth*, No. 2:18-cr-20027, ECF No. 67 (D. Kan. June 18, 2021) (collecting cases). Over 25% of those autistic defendants received *no jail time. Id.* And no other autistic defendant convicted of a non-production offense received a sentence as harsh as the 30-year sentence Thomas received. *Id.* In fact, counsel is not aware of another autistic defendant receiving *any* upward variance—much less one as severe as the 8-year variance here—in a non-production child pornography case. *See id.*

The drastic disparity between Thomas's sentence and those received by other defendants—autistic or not—requires intervention by this Court to fulfill a crucial purpose of appellate review: "helping to avoid excessive sentencing disparities." *United States v. Booker*, 543 U.S. 220, 264 (2005).

### 5. The district court clearly erred in balancing the sentencing factors because none of them justify a significant upward variance.

The district court also clearly erred in balancing the statutory sentencing factors. None of the § 3553(a) factors justify the district

court's 8-year upward variance. If anything, they support a significant *downward* variance.

**Thomas's history, characteristics, and need for medical care.** When imposing a sentence, courts must consider the "history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1), and the need to provide a defendant with necessary "medical care," *id.* § 3553(a)(2)(D). As explained above, Thomas's autism spectrum disorder contributed to his offense conduct and mitigates his culpability. *See supra* 29–36. As for medical care, Thomas needs "individualized counseling from a therapist trained to treat patients with ASD, which [he] is unlikely to receive in prison." *See Knott*, 638 F. Supp. 3d at 1322. As other courts recognize, these factors support a significant *downward* variance—not an above-Guidelines sentence. *See supra* 51–52.

**Nature, circumstances, and seriousness of the offense.** Courts must also consider the "nature and circumstances of the offense," 18 U.S.C. § 3553(a)(1), as well as the "seriousness of the offense," *id.* § 3553(a)(2)(A). Although possessing and distributing child pornography are serious and reprehensible crimes, the circumstances of Thomas's case—even putting aside the impact

53

autism spectrum disorder had on his conduct, *see supra* 29–36, 40–45—are quite typical.

Thomas used the most common method—a peer-to-peer file sharing network—for receiving and distributing child pornography. *See* U.S. Sent'g Comm'n, *Federal Sentencing of Child Pornography*, *supra*, at 33–34. Most offenders—like Thomas—store their collections on multiple devices. *Id.* at 34. The ordinary case also includes disturbing images of young victims and sadomasochistic abuse. *Id.* at 19. And although Thomas had tens of thousands of images and videos, that is not unusual. Indeed, the "typical offender's collection" is "voluminous" because "technology has facilitated the ability to acquire and send enormous quantities of child pornography." *Id.* at 30. So offenders often have "collections numbering in the hundreds of thousands or even millions of images and videos." *Id.* at 34. In short, nothing about the circumstances of Thomas's offense justifies an upward variance of more than 8 years above the Guidelines.[5]

---

[5] The district court noted that Thomas "used VPNs to conceal his activities." ROA.1422–23. But Thomas primarily used VPNs to protect his network from cyberattacks, not to evade law enforcement. ROA.2352. And, in any event, concealment is all but inherent in criminal activity and cannot justify the district court's significant upward variance.

**Just punishment.** Another factor courts must consider is the need "to provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A). But it is not "just" to punish Thomas much more severely than other defendants when a neurodevelopmental disorder played a large part in his offense and the supposedly aggravating factors the district court relied on are connected to that condition. *See supra* 29–36, 40–45.

**Deterrence.** Courts must also consider the need for the sentence to "afford adequate deterrence to criminal conduct." 18 U.S.C. § 3553(a)(2)(B). As discussed above, the Guidelines—before any variance—recommend harsh sentences for non-production child pornography offenses. *See supra* 26–28. There is no reason an upward variance here is required to deter criminal conduct.

**Protecting the public.** Another factor courts must consider is the need for a sentence to "protect the public from further crimes of the defendant." 18 U.S.C. § 3553(a)(2)(C). As discussed above, autism spectrum disorder makes it exceedingly unlikely that Thomas will ever harm a child. *See supra* 45–48. Even aside from autism, this factor cannot bear the weight the district court gave it.

*First*, the district court largely relied on Thomas's admission that he would consider having sex with a child if the child prompted the

encounter and if they had a secure environment. ROA.1426–27. But Thomas has never acted on this desire.[6] ROA.2224. And "unacted-upon prurient sexual thoughts, just like 'a defendant's abstract beliefs, however obnoxious to most people, may not be taken into consideration by a sentencing judge.'" *United States v. McLaurin*, 731 F.3d 258, 263–64 (2d Cir. 2013) (quoting *Wisconsin v. Mitchell,* 508 U.S. 476, 485–86 (1993)).

*Second*, the district court's protect-the-public justification rings hollow since Thomas—who the court agreed is "not likely" to harm a child, ROA.1427—received a much higher sentence than defendants who have *actually* exploited children. As noted above, the average sentence for defendants convicted of *producing* child pornography is much lower than Thomas's sentence. *See supra* 50. And the Federal Reporter is replete with cases where defendants who sexually abused children—often many children over several years—received

---

[6] The district court noted Thomas's admission that he accidentally touched a girl's chest while roughhousing at a church event. ROA.1428. But Thomas denied that the incident was sexual. ROA.2224. In any event, this isolated incident more than four years ago can hardly justify an 8-year upward variance.

either the same sentence as Thomas or a lower sentence.[7] So Thomas's sentence "cannot be justified by public protection, given that a defendant who repeatedly has sex with a child would face a far more lenient sentence." *See United States v. Sawyer*, 672 F. App'x 63, 66 (2d Cir. 2016) (holding 30-year sentence for child pornography offenses substantively unreasonable).

**Kinds of sentences available.** Sentencing courts must also consider "the kinds of sentences available." 18 U.S.C. § 3553(a)(3). If anything, this factor supports a *shorter* term of imprisonment to protect Thomas from bullying and victimization in prison. *See supra* 37–39. That is especially true because the district court imposed strict conditions of supervised release—that Thomas is likely to

---

[7] *See, e.g.*, *United States v. Zayas*, 758 F.3d 986, 988 (8th Cir. 2014) (affirming 240-month sentence for defendant who admitted "tak[ing] pictures of himself having sexual intercourse with his eleven year old nephew"); *United States v. Irey*, 612 F.3d 1160, 1166 (11th Cir. 2010) (determining that 30-year sentence should be imposed where defendant "raped, sodomized, and sexually tortured fifty or more little girls, some as young as four years of age, on many occasions over a four- or five-year period"); *United States v. Castro-Valenzuela*, 304 F. App'x 986, 988 (3d Cir. 2008) (affirming 220-month sentence for defendant who recorded himself violently sexually assaulting his girlfriend's seven-year-old niece); *United States v. Hesson*, 46 F. App'x 226 (5th Cir. 2002) (affirming 240-month sentence for defendant who "sexually exploited and videotaped at least seventy-four other minor males over a period of at least fifteen years").

comply with—that will accomplish the purposes of sentencing without putting his life at risk. *See supra* 47–48.

**Avoiding sentencing disparities.** Courts must also "avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). As discussed above, the district court's sentence results in a drastic disparity between Thomas and other defendants convicted of similar conduct. *See supra* 49–52. So this factor supports a significant *downward* variance, not an upward variance.

**Promoting respect for the law.** Finally, courts must consider the need for a sentence "to promote respect for the law." 18 U.S.C. § 3553(a)(2)(A). And "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (cleaned up). That is especially true in cases involving child pornography. "The hideous nature of an offender's conduct must not drive us to forget that it is not *severe* punishment that promotes respect for the law, it is *appropriate* punishment." *United States v. Olhovsky*, 562 F.3d 530, 551 (3d Cir. 2009) (holding sentence for possessing child pornography

substantively unreasonable). And "revulsion over these crimes cannot blind [courts] to the individual circumstances of the offenders who commit them." *Id.* at 552.

The district court's severe sentence fails to promote respect for the law. The court was so determined to dispense harsh punishment that it failed to consider circumstances that mitigate Thomas's culpability and make his case a far cry from an ordinary child pornography case. Unlike defendants who callously disregard the horrible abuse taking place in child pornography, autism spectrum disorder prevented Thomas from perceiving that children were being harmed. Although other defendants know that looking at child pornography is morally wrong, that is not the case for someone who is naïve about social taboos and views himself as the same social-emotional age as the children in the videos. And while some defendants acquire massive collections of child pornography because of an insatiable appetite for disturbing material, Thomas's large collection was due to compulsive behaviors associated with autism. Punishing a defendant for being born with a neurodevelopmental disorder fails to promote respect for the law.

\* \* \*

> In sentencing, as in other areas, district judges at times make mistakes that are substantive. At times, they will impose sentences that are unreasonable. Circuit courts exist to correct such mistakes when they occur.

*Rita*, 551 U.S. at 354.

The district court's 30-year sentence is far greater than necessary given the circumstances of Thomas's case. This Court should correct the district court's mistake and hold that Thomas's sentence is substantively unreasonable.

## CONCLUSION

The Court should hold that the district court's sentence is substantively unreasonable, vacate Thomas's sentence, and remand for resentencing.

Respectfully submitted.

MAUREEN SCOTT FRANCO
Federal Public Defender

s/ Carl R. Hennies
CARL R. HENNIES
Assistant Federal Public Defender
Western District of Texas
300 Convent Street, Suite 2300
San Antonio, Texas 78205
(210) 472-6700
(210) 472-4454 (Fax)

*Attorney for Defendant-Appellant*

# CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMIT

1. This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 11,516 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this document has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in 14-point Century Schoolbook in body text and 13-point in footnotes.

s/ Carl R. Hennies
CARL R. HENNIES
*Attorney for Defendant-Appellant*

December 11, 2024